IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ABDUL HAKIM AHMAD, | § | |
| (a/k/a Albert Jenkins, | § | |
| A.B. Jenkins, III, | § | |
| Albert Jenkins, III, | § | |
| Albert B. Jenkins, III) | § | |
| (TDCJ-CID #663500) | § | |
| | § | |
| **Plaintiff,** | § | |
| VS. | § | CIVIL ACTION NO. H-08-1591 |
| | § | |
| SHERIFF TOMMY THOMAS, *et al.,* | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## MEMORANDUM AND OPINION

Abdul Hakim Ahmad, a state inmate, sued in May 2008, alleging that he was not allowed to practice his Islamic faith while in the Harris County Jail ("HCJ"), in violation of the First Amendment. Ahmad, proceeding *pro se* and *in forma pauperis*, sues Sheriff Tommy Thomas, Chaplain George Burrell, Captain J. T. Hart, Sergeant Zoch, Sergeant Smith, and Deputy D. Criss.

After Ahmad filed a more definite statement describing his claims, (Docket Entry No. 30), this court ordered service on Sheriff Adrian Garcia, Chaplain Burrell, Captain J. T. Hart, Sergeant Zoch, Sergeant Smith, and Deputy D. Criss. (Docket Entry No. 32). Because Adrian Garcia has replaced Thomas as Harris County Sheriff, the court substitutes Garcia in place of Thomas pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

Sheriff Adrian Garcia, Captain J. T. Hart, Sergeant Zoch, Sergeant Smith, and Deputy D. Criss ("the Defendants") have filed a motion for summary judgment as to the claims against them

in their individual capacities, (Docket Entry No. 48), and a separate motion for summary judgment as to the claims against them in their official capacities.  (Docket Entry No. 49).  Ahmad has responded.  (Docket Entry No. 52).  Ahmad has filed a partial motion for summary judgment. (Docket Entry No. 66).  The Defendants have responded, (Docket Entry No. 70), and Ahmad has filed a reply. (Docket Entry No. 75).  Though Chaplain Burrell was served and filed an answer, (Docket Entry No. 45), he did not file his own motion for summary judgment or join the motions for summary judgment filed by the Defendants.  Ahmad named Sergeant Brown and Chaplain Mazhar Kazi as defendants, but they were not served.

Based on the pleadings, the motions and responses, the summary judgment record, and the applicable law, this court grants the motions for summary judgment filed by the Defendants and denies the partial motion for summary judgment filed by Ahmad.  This court dismisses the claims against Chaplain Burrell, Sergeant Brown, and Chaplain Kazi sua sponte based on the summary judgment evidence on file.  Final judgment is entered by separate order.  The reasons for these rulings are stated below.

## I.    Ahmad's Allegations

In his original complaint, Ahmad alleges that Sheriff Thomas "violated the Plaintiff's constitutional rights by enforcing a policy, practice and or custom by and through his agents staff and or employee which deny the Plaintiff the opportunity to practice his religion, to wit: Islam." (Docket Entry No. 1, Complaint, p. 3).

Ahmad next alleges that Sheriff Thomas implemented the HCJ indigent inmate program thereby depriving Ahmad of correspondence supplies for thirty consecutive days of incarceration. He also complains that his mail was returned to the courts as undeliverable, though he remained

incarcerated in the HCJ. He believes that jailers tampered with his legal mail from September 4, to December 15, 2008. As further support for this claim, he states that he requested copies of his complaint from the court, but he never received them.

Third, he alleges in his original complaint that Sheriff Thomas enforced a policy of divesting Ahmad of all undergarments. He complains that he only received a clean uniform once every seven days. (*Id.* at 4). He complains that the HCJ failed to issue adequate hygiene supplies such as soap and toothpaste. As to Ahmad's allegations against Sheriff Thomas and the remaining defendants, Ahmad states that the violation of his civil rights took place from March 29, to April 2008 and from August 15, 2008 to January 27, 2009. (Docket Entry No. 30, Plaintiff's More Definite Statement, p. 1).

Ahmad complains that on March 29, 2008, Sergeant Brown confiscated his prayer carpet, Kufi cap, and Islamic literature during the intake process. Sergeant Brown allegedly violated Ahmad's right to practice his religion by not allowing Ahmad to have his prayer carpet. Sergeant Brown allegedly stated that he was enforcing a chaplaincy policy which prohibited Muslim inmates from exercising their faith in the HCJ. Ahmad states that several days after being booked into the HCJ, his Arabic dictionary and Koran were returned, but he was told that HCJ policy prohibited him from having his prayer carpet.

Ahmad alleges that Chaplain Burrell failed to establish an Islamic religious program in the HCJ. Ahmad asserts that Chaplain Burrell violated Ahmad's right to practice his religion by prohibiting Muslim inmates from congregating for religious services, Jumu'ah, which is the Friday afternoon prayer service that is mandatory for all male Muslims over seven years old. He states that

Jumu'ah is the main day for congregational worship and is held weekly on Friday from 12:00 p.m. to 2:00 p.m.

Ahmad states that on April 7, 2008, he met with Sergeant Brown and Chaplain Kazi, and they told him that HCJ policy did not permit Islamic inmates to congregate.  They further told Ahmad that Islamic inmates could not have a prayer carpet or Kufi cap.  Ahmad asserts that Chaplain Kazi[1] violated Ahmad's First Amendment rights by refusing Ahmad access to his prayer carpet.  According to Ahmad, Chaplain Kazi told him that he had no right to congregate with other Muslim inmates. Chaplain Kazi further told Ahmad that if he wanted to pray, he would have to do so on the bare floor of his dormitory even if it was unclean.

Ahmad asserts that Chaplain Burrell[2] has enforced a policy that deprived Ahmad of his prayer carpet and Kufi cap.  In his More Definite Statement, Ahmad states that his prayer carpet was confiscated, and he spoke with HCJ officials on the matter.  He told jail officials that he was housed with thirty-five other inmates in an open bay dormitory, and he needed the prayer carpet to serve as a clean surface on which he could pray.  (Docket Entry No. 30, Plaintiff's More Definite Statement, p. 7).  Ahmad claims that HCJ officials told him that he should "just pray on the dirty floor or move to Pakistan somewhere if [he] wanted to be Muslim." (*Id.*).  Ahmad states that the confiscation of his prayer rug "hindered my ability to perform prayers in the dormatory[sic]." (*Id.*).

---

[1]In his original complaint, Ahmad named Chaplain Kazi as a defendant.  However, in his more definite statement, Ahmad did not name Chaplain Kazi as a defendant.  When issuing the order for service, this court relied on Ahmad's responses to this court's interrogatories concerning the individuals he was suing.

[2]In his original complaint, Ahmad named Chaplain John Doe as a defendant and complained that he prevented Muslim inmates from congregating.  In his More Definite Statement, Ahmad named Chaplain Burrell as a defendant.  It appears that Ahmad substituted Chaplain John Doe with Chaplain Burrell.

Ahmad asks that a weekly Jumu'ah prayer service be established in the HCJ. He asks that he be allowed to use his prayer carpet and Kufi cap in his cell. He further asks that he be provided with undergarments, personal hygiene items, and legal correspondence supplies. He seeks nominal damages of $1.00; punitive damages of $20,000.00; and compensatory[3] damages of $15,000.00.

## II.   The Issue of Mootness

Ahmad seeks to compel the Defendants to provide Jumu'ah services at HCJ. Defendants argue that Ahmad's claims for injunctive relief are moot because the HCJ will conduct Jumu'ah services for Muslim inmates. (Docket Entry No. 70, Defendant's Response, pp. 5-6). In a supplemental affidavit, Don Savell testified as follows:

> 2.    I am licensed as a peace officer by the State of Texas, and have been so licensed for twenty-three years. I am employed by the

---

[3]

Citing *Mayfield v. Tex. Dep't of Criminal Justice,* 529 F.3d 599, 605 (5th Cir. 2008), Sheriff Garcia further argues that Ahmad's claims for compensatory damages are barred by Title 42 U.S.C. § 1997e(e) of the Prison Litigation Reform Act. (Docket Entry No. 70, Defendant's Response, p. 2 n.2). The PLRA provides that, "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). The Fifth Circuit has held that the application of this provision turns on the relief sought by a prisoner, and that it prevents prisoners from seeking compensatory damages for violations of federal law where no physical injury is alleged. *See Geiger v. Jowers,* 404 F.3d 371, 375 (5th Cir. 2005) (per curiam).

Despite the limitations imposed by § 1997e(e), the Fifth Circuit has recognized that a prisoner can, absent a showing of physical injury, pursue punitive or nominal damages based upon a violation of his constitutional rights. *See Hutchins v. McDaniels,* 512 F.3d 193, 197-98 (5th Cir. 2007)(per curiam). In *Mayfield v. Tex. Dep't of Criminal Justice,* 529 F.3d 599, 605 (5th Cir. 2008), the Fifth Circuit noted that Mayfield had not alleged any physical injury, and his complaint sought only compensatory damages. As a result, the Fifth Circuit concluded that Mayfield's claims for damages were barred by § 1997e(e). *See Geiger,* 404 F.3d at 375 (applying § 1997e(e) to bar prisoner's claim for damages brought under § 1983 alleging a First Amendment violation). In the instant case, however, Ahmad seeks compensatory damages as well as nominal and punitive damages. (Docket Entry No. 1, Complaint, pp. 8-9). Though Ahmad's claims for compensatory damages are barred by § 1997e(e), his claims for nominal and punitive damages are not so barred.

Harris County Sheriff's Office ("the Sheriff's Office") where I hold the rank of sergeant. I am the Harris County Jail Chaplaincy Director. My responsibilities include overseeing and coordinating the one hundred thirty-five (135) volunteer chaplains who minister to the religious and spiritual needs of the inmates in the Harris County Jail.

3.      I am in charge of the religious services for the Harris County Jail facilities. Presently, there are three Muslim services conducted at the Harris County Jail facility located at 1200 Baker Street, Houston, Texas. Those services are conducted each Tuesday and Wednesday, The Harris County Jail now also has a Friday prayer service for Muslim inmates at the 1200 Baker Street facility.

4.      During the week of May 24, 2010, the Harris County Sheriff's Office will be expanding its Muslim services to include a service each Wednesday at its facility located at 701 N. San Jacinto, Houston, Texas.

5. In addition, the Islamic Society continues to come to the Harris County Jail once a month on Fridays.

6. The Harris County Sheriff's Office is working to increase its volunteer base who minister to Muslim inmates to cover all three of its jail facilities.

(Docket Entry No. 70, Defendant's Response, Ex. A, pp. 1-2).

This court determines that Ahmad's claims are not moot, because this case falls within an exception to the mootness doctrine, the voluntary cessation exception. "A case is not to be dismissed as moot if the defendant voluntarily ceases the allegedly improper behavior but is free to return to it at any time." Erwin Chemerinsky, *Federal Jurisdiction* 139 (5th ed. 2007).

A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. [However,] [t]he heavy burden of persua{ding} the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness.

*Id.* at 141 (braces in original; brackets added) (quotation marks omitted) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).   "[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice," even in cases in which injunctive relief is sought. *Meza v. Livingston*, 607 F.3d 392, 400 (5th Cir. 2010) (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)).   Federal courts have long-recognized that allegations by a defendant that its voluntary conduct has mooted the plaintiff's case require closer examination than allegations that "happenstance" or official acts of third parties have mooted the case. *See DeFunis v. Odegaard*, 416 U.S. 312, 316-19 (1974); *Locke v. Bd. of Pub. Instruction of Palm Beach County*, 499 F.2d 359, 363-64 (5th Cir. 1974); *see also Laidlaw*, 528 U.S. at 214, (Scalia, J., dissenting).

Having determined that Ahmad's claims are not moot, the court will address the merits of his claims.

## III.   The Motion for Summary Judgment

### A.   The Legal Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).   "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986)).   If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the

absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

**B.     The Summary Judgment Evidence**

In support of their motions, the Defendants provide the following summary judgment evidence:

(1)     Affidavit of Sergeant Zoch;

(2)     Affidavit of Sergeant Smith;

(3)     Affidavit of Captain John Hart;

(4)    Affidavit of Deputy Darryl Criss;

(5)    Affidavit of Dalora Miller dated November 17, 2009;

(6)    Affidavit of Sergeant Don Savell; and

(7)    Affidavit of Dalora Miller dated November 19, 2009.

## IV.    The Claims Against Sheriff Garcia in His Official Capacity

Ahmad's complaint states that Sheriff Garcia is sued "in his official capacity as Sheriff of Harris County," for violation of the right to exercise his religion. (Docket Entry No. 1, Complaint, p. 2). "Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. New York City Dep't. of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)).  A suit against a government official in his official capacity is the same as a suit against the entity the official represents. *Graham*, 105 S. Ct. at 3105.  The claim that Ahmad has asserted against Garcia in his official capacity is a claim against Harris County, although Harris County was not named as a defendant. *See Bennett v. Pippin*, 74 F.3d 578, 584 (5th Cir.), *cert. denied*, 117 S. Ct. 68 (1996) ("A suit against the Sheriff in his official capacity is a suit against the County.").

A municipality such as Harris County "can be held liable for its policies and customs that engender constitutional deprivation, but it cannot be held liable for the actions of its non-policymaking employees under a theory of respondeat superior." *Williams v. Kaufman County*, 352 F.3d 994, 1013 (5th Cir. 2003).  "Under the decisions of the Supreme Court and [the Fifth Circuit], municipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694);

*see Cox v. City of Dallas, Tex.*, 450 F.3d 734, 748 (5th Cir. 2005). There must be both municipal culpability and causation. *See Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998). "Culpability includes both the involvement of a municipal policymaker and affirmative municipal action." *Piotrowski*, 237 F.3d at 578 n.17. "[T]he unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998)).

Ahmad has not shown a basis to hold Sheriff Garcia liable in his official capacity or to hold Harris County liable under section 1983. Ahmad asserts that Sheriff Garcia, acting through his subordinates, enforced a policy that caused the violation of Ahmad's First Amendment right to exercise his religion. Ahmad asserts that while he was in the custody of the HCJ, the defendants did not allow Muslim inmates to congregate for the Friday Jumu'ah prayer.

It is well-established that a prisoner retains certain First Amendment rights notwithstanding his incarceration. *See, e.g., Pell v. Procunier*, 417 U.S. 817, 822 (1974). Nevertheless, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Bell v. Wolfish,* 441 U.S. 520, 545-46 (1979) (quoting *Price v. Johnston,* 334 U.S. 266, 285 (1948)). In the First Amendment context, a prisoner retains only those rights "that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell,* 417 U.S. at 822. It is generally recognized that security, order, and rehabilitation are legitimate penological objectives. *Morgan v. Quarterman,* 570 F.3d 663 (5th Cir. 2009)(citing *Procunier v. Martinez,* 416 U.S. 396, 413-14 (1974)).

This court reviews prison regulations that encroach on fundamental constitutional rights under the standard set forth by the Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987), to determine whether the regulation is "reasonably related to legitimate penological interests." *Id.* at 89; *see O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349-53 (1987) (applying *Turner*'s standard to free exercise claim brought by prisoner under § 1983).

In evaluating the reasonableness of a prison regulation, *Turner* instructs this court to consider the following four factors:

> (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation . . . will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there are "ready alternatives that could fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests.

*Turner,* 482 U.S. at 89-91 (internal citations and quotation marks omitted). *Turner*'s standard also includes a neutrality requirement - "the government objective must be a legitimate and neutral one . . . [and] [w]e have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion." *Id.* at 90. *See Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 854, 860-61 (5th Cir. 2004) ("Foremost, TDCJ's regulation is neutral .... There is no evidence that TDCJ's policy is targeted toward the Church of Christ, or favors one religious group over another." (internal quotation marks and citations omitted)). While *Turner*'s standard encompasses four factors, the Fifth Circuit has noted that rationality is the controlling factor, and a court need not weigh each factor equally. *See Scott v. Miss. Dep't of Corr.,* 961 F.2d 77, 81 (5th Cir. 1992).

The Supreme Court acknowledged the particular importance of the first factor, explaining that in some cases the second, third, and fourth factors can "add little, one way or another, to the first factor's basic logical rationale." *Beard v. Banks,* 548 U.S. 521, 532 (2006). In the light of the first factor, "the real task" is to determine whether there is a "reasonable relation" - that is, "more than simply a logical relation" - between the prison regulation and the legitimate penological interest. *Id.* at 533. Further, this court's analysis must give due regard to the decisions of prison officials. *Samford v. Dretke,* 562 F.3d 674 (5th Cir. 2009). "'[P]rison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations.'" *Turner,* 482 U.S. at 89 (omission and alteration in original); *see also Freeman v. Tex. Dep't of Criminal Justice,* 369 F.3d 854, 863 (5th Cir. 2004). ("[T]he Court is equally cognizant of the inherent demands of institutional correction, the deference owed to prison administrators, and the subjugation of individual liberty that lawful incarceration necessarily entails."). This court now turns to the application of these four factors in light of the deference owed to prison administrators.

Ahmad claims that his free exercise rights were improperly limited because Harris County is not allowing Muslim inmates to have a Jumu'ah prayer service. The defendants insist that Harris County does not have a custom, policy, or procedure of denying Friday Jumu'ah services. Defendants assert that the requirement of the Islamic faith is that the Friday Jumu'ah service may only be conducted by an imam. According to Dr. Kazi, a volunteer chaplain who addresses the religious and spiritual needs of Muslim inmates, there are insufficient imam volunteer chaplains to conduct such a service at the HCJ. Defendants maintain that, as a result, Harris County does not have a policy of refusing to conduct the service Ahmad requests. Rather, they are unable to do so because of an inadequate number of volunteers.

Don Savell testified as follows:

> 2.      I am licensed as a peace officer by the State of Texas, and have been so licensed for 23 years. I am employed by the Harris County Sheriff's Office ("the Sheriff's Office") where I hold the rank of sergeant. I am the Harris County Jail Chaplaincy Director. My responsibilities include overseeing and coordinating the one hundred thirty-five (135) volunteer chaplains who minister to the religious and spiritual needs of the inmates in the Harris County Jail.

> 3.      In my position as Jail Chaplaincy Director, I am familiar with the request made by Abdul Hakim Ahmad, also known as Albert Jenkins ("Plaintiff"), that the Harris County Jail conduct a Friday prayer service for the Muslim inmates. I talked with Dr. Kazi, who is an iman[4] [sic] and a chaplaincy volunteer at the Harris County Jail, about Plaintiff's request. Dr. Kazi advised me that the Muslim Friday prayer service could only be conducted by an iman [sic], and that there were insufficient iman[sic] volunteers to conduct such a service in the Harris County Jail each Friday. Dr. Kazi comes to the Harris County Jail twice a month to see to the specific religious needs of Muslim inmates, and I am aware that he met with Plaintiff and gave him a Koran.

> 4.      It is correct that there are Christian services held in the Harris County Jail. The reason that Christian services can be provided more readily than the Friday prayer service Plaintiff requested is that there are sufficient Christian volunteers to lead the services.

(Docket Entry No. 49, Defendants' Motion for Summary Judgment, Ex. A, pp. 1-2).

---

[4]Merriam-Webster's Dictionary defines "Imam" as follows:
1. the prayer leader of a mosque
2. a Muslim leader of the line of Ali held by Shiites to be the divinely appointed, sinless, infallible successors of Muhammad
3. any of various rulers that claim descent from Muhammad and exercise spiritual and temporal leadership over a Muslim region
http://www.merriam-webster.com/dictionary/imam
"Iman" is an Islamic term usually translated as belief or faith and is often used to refer to the strength of conviction in a Muslim.

The defendants further cite the Harris County Sheriff's Office Inmate Handbook, which is distributed to all inmates upon becoming incarcerated in the Harris County Jail, which provides, in relevant part, as follows:

> 1. Religion
> 1. A Jail Chaplain is available to you for your personal or religious counseling.
> a. Religious services are scheduled on a regular basis for various denominations and faiths.
> b. You are encouraged to attend a service of your choice as well as any instructional classes which may be conducted.
> c. Both religious services and Alcoholics Anonymous (A.A.) meetings will be scheduled by appropriate personnel.
> 2. If you have a special religious need(s) which is not currently being met, you may consult with a Jail Chaplain.
> a. The Sheriff's Department will attempt to reasonably accommodate those inmates who, because of their religion, are required to observe special dietary restrictions.
> b. All requests for special diets must be approved by the Medical Division Dietician.

(Docket Entry No. 49, Defendants' Motion for Summary Judgment, Ex. B, p. 12).

In his response to the Defendants' motion for summary judgment, Ahmad states that he was previously confined in the TDCJ, and during that confinement, he was allowed to participate in Jumu'ah services.  He explains that inmates in the TDCJ were allowed to conduct Jumu'ah service without outside volunteers.  Ahmad explains that while he was confined in the TDCJ, he was elected to serve as an imam.  Ahmad further describes the procedure for becoming an imam. Liberally construed, Ahmad complains that Muslim inmates in the HCJ should be allowed to congregate without an outside volunteer.  He appears to argue that because he had previously served as an imam while in the TDCJ, he should be allowed to do so in the HCJ as well. The Fifth Circuit has analyzed a similar volunteer policy implemented by the TDCJ.  The Fifth Circuit evaluated the outside

volunteer policy under *Turner*'s standard and upheld the policy on each occasion. *See Baranowski v. Hart*, 486 F.3d 112, 121-22 (5th Cir. 2007); *Adkins v. Kaspar*, 393 F.3d 559, 565 (5th Cir. 2004).

In *Adkins,* the plaintiff argued that his free exercise rights were denied when he and other members of the Yahweh Evangelical Assembly ("YEA") were not permitted to assemble on every Sabbath day and on particular holy days because no volunteer deemed acceptable by the defendants was available to supervise the meetings. 393 F.3d at 564. Applying the *Turner* factors, the court in *Adkins* first recognized that the Fifth Circuit had recently held that the TDCJ's religious accommodation policy was rationally related to legitimate government objectives. *Id.* (citing *Freeman,* 369 F.3d at 861). The court then looked to the second *Turner* factor, recognizing that "'[t]he pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, the prison affords the inmates opportunities to exercise their faith.'" *Adkins,* 393 F.3d at 564 (quoting *Freeman,* 369 F.3d at 861). The court concluded that YEA members had alternative means of exercising their religion, given their access to religious materials and their ability to hold and attend live services when a spiritual leader was available. *Id.* Applying the third *Turner* factor, the court reasoned:

> The 20 to 25 active members of YEA constitute less than one percent of the large inmate population at Coffield. Requiring the defendants to accommodate every religious holiday and requirement of the YEA, regardless of the availability of volunteers, space, or time, could "spawn a cottage industry of litigation and could have a negative impact on prison staff, inmates and prison resources." Moreover, if Adkins were accommodated and other similarly situated small religious groups were not, the YEA could appear to be favored over the others, a perception that could have a negative effect on prison morale and discipline.

*Id.* at 565 (quoting *Freeman,* 369 F.3d at 862).  Finally, under the fourth *Turner* prong, the court determined that "no obvious, easy alternatives would accommodate both Adkins and the TDCJ's administrative needs." *Id.* (internal quotation marks and citation omitted).  The *Adkins* court concluded that in light of the *Turner* factors, the dismissal of the plaintiff's free exercise claim was proper.

In *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007), the Fifth Circuit determined that the prison policies at issue were similar to those in *Adkins* and were logically connected to legitimate penological concerns of security, staff and space limitations, and that there were no obvious or easy alternatives.  Baranowski's main complaint was that the prison could accommodate the need for weekly Jewish services if inmates were permitted to lead the services without the assistance of a rabbi or approved outside volunteer.

Relying on *Adkins*, the Fifth Circuit rejected this argument.  The summary judgment evidence showed that despite being denied weekly Sabbath services and other holy day services when a rabbi or approved volunteer was not present, Baranowski retained the ability to participate in alternative means of exercising his religious beliefs, including the ability to worship in his cell using religious materials and the ability to access the chapel and lockers containing religious materials on certain days and times. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 351-52 (1987) (upholding a regulation that prevented Muslim prisoners from attending Friday Jumu'ah services, and recognizing that although there were "no alternative means of attending Jumu'ah [since] respondents' religious beliefs insist that it occur at a particular time," inmates were "not deprived of all forms of religious exercise, but instead freely observe a number of their religious obligations").

Noting that the Jewish population at the TDCJ constituted less than one percent of the total inmate population, the Fifth Circuit concluded that requiring the TDCJ to accommodate every religious holiday and requirement of the Jewish faith, regardless of the availability of qualified volunteers and adequate space and security, "would spawn a cottage industry of litigation and could have a negative impact on prison staff, inmates, and prison resources." *Baranowski*, 486 F.3d at 122 (quoting *Freeman,* 369 F.3d at 862).

Applying *Turner*'s four factors to the HCJ's outside-volunteer policy in this case, this court finds the policy itself is reasonably related to a legitimate penological interest. Though not expressly stated by the HCJ, the court presumes that the HCJ imposed the volunteer requirement to address jail security concerns, as well as staff and space limitations. These are valid penological interests. The Fifth Circuit has recognized in previous cases that the TDCJ's volunteer requirement is rationally related to these legitimate concerns. *See Baranowski*, 486 F.3d at 121 (affirming a district court's grant of summary judgment, in part, because "[t]he record demonstrates that the prison policies at issue here are logically connected to legitimate penological concerns of security, staff and space limitations").

The summary judgment record reveals the neutrality of the policy's application. In prior cases where the Fifth Circuit has affirmed summary judgment on similar § 1983 claims, the Fifth Circuit has relied on the neutrality of the prison's policy in doing so. *See Adkins* 393 F.3d at 571 (noting that, "[t]he requirement of an outside volunteer ... is a uniform requirement ...."); *Freeman,* 369 F.3d at 860 ("Foremost, TDCJ's regulation is neutral ...."); *Green v. Polunsky,* 229 F.3d 486, 490 (5th Cir. 2000)(finding that a prison policy requiring short hair and clean-shaven faces does not violate inmates' right to free exercise, in part because the "the policy is neutral, affecting all inmates,

regardless of their religious beliefs"); *Mumin v. Phelps,* 857 F.2d 1055, 1057 (5th Cir. 1988)(noting that, "there is not a shred of evidence that the appellants are being denied any rights because they are Muslims").

The HCJ submitted evidence that its volunteer requirement is imposed uniformly.   The summary judgment evidence suggests that inmates of all faiths are required to have an outside volunteer before conducting special religious services.   Sergeant Savell testified that Christian services are conducted more frequently because more volunteers are available.  He explained that Jumu'ah services cannot be provided for Muslim inmates because the service must be conducted by an imam.  He explains there is an insufficient number of volunteer imams to lead Jumu'ah services in the HCJ.  (Docket Entry No. 49, Defendants' Motion for Summary Judgment, Ex. A, p. 1).

Requiring neutrality ensures that the prison's application of its policy is actually based on the justifications it purports, and not something more nefarious.  *Mayfield v. Tex. Dep't of Criminal Justice,* 529 F.3d 599 (5th Cir. 2008).  Ignoring *Turner's* neutrality requirement would allow prison regulators to justify a policy based on a legitimate interest applicable to the overall prison population, while applying the policy in an arbitrary or discriminatory manner in violation of a particular subgroup's First Amendment rights. In reaching this conclusion, the Fifth Circuit did not suggest that "every religious sect or group within a prison - however few in number - must have identical facilities or personnel." *Mayfield,* 529 F.3d at 609 (quoting *Cruz v. Beto,* 405 U.S. 319, 322 n.2 (1972)).  But under *Turner,* neutrality must be ensured, or its absence sufficiently explained in light of a legitimate penological interest, for summary judgment to be appropriate. *See Thornburgh v. Abbott,* 490 U.S. 401, 415-16 (1989) (holding that *Turner's* neutrality requirement allows a prison

policy to draw distinctions so long as those distinctions flow from the government's legitimate penological interest).

Considering the first *Turner* factor, the court finds that there is a valid, rational connection between the HCJ policy of requiring an outside volunteer for religious services and the legitimate governmental interest put forward to justify it.

*Turner's* second element requires consideration of the alternative means of worship available in spite of the prison regulation. "The pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, the prison affords the inmates opportunities to exercise their faith." *Freeman,* 369 F.3d at 861. In other words, this court asks "whether the regulation entirely stifles the prisoner's religious expression." *Scott,* 961 F.2d at 81.

The summary judgment evidence shows that Ahmad may gather for group worship when an outside volunteer is present. He may also worship individually in his cell with items approved for personal possession. The summary judgment evidence shows that the HCJ provided Ahmad with a Koran. The HCJ's policy also allows Ahmad the opportunity to meet individually with an approved spiritual advisor twice monthly. The record sufficiently establishes that Ahmad had access to alternative means of worship.

As to *Turner's* third prong, the Fifth Circuit has recognized the heavy burden on guards, other inmates, and prison resources that could result from requiring the HCJ to accommodate the request of Muslim inmates. Ahmad argues that roving officers could monitor the Jumu'ah prayer service and obviate the need for an outside volunteer. (Docket Entry No. 52, pp. 5-6). This court finds that allowing the Muslim inmates to meet without a volunteer would require the HCJ to pull an officer from other necessary security duty in order to monitor the religious service. If all the

religious groups in the HCJ requested the ability to meet without an outside volunteer, jail security could be seriously compromised by the need to remove personnel from their usual security posts. Finally, other than the request to allow the Muslim inmates to meet without an outside volunteer, Ahmad presents no other alternative means of accommodation. Allowing inmates to gather for religious services without an outside volunteer could impose a serious strain on jail security. This potential strain represents more than a de minimis cost to HCJ's valid penological interest in maintaining security.

As noted, municipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694). Ahmad has not established these elements.

First, Ahmad has not shown that Harris County prevented him from exercising his religion. Second, Ahmad has not shown any basis to impose municipal liability. Ahmad has identified a "policymaker" by suing Sheriff Garcia. Although Ahmad does not explicitly identify Sheriff Garcia as a policymaker, under Texas law, a county sheriff has final policymaking authority over law enforcement. *See Turner v. Upton Cnty., Tex.*, 915 F.2d 133, 136 (5th Cir. 1990) ("It has long been recognized that, in Texas, the county sheriff is the county's final policymaker in the area of law enforcement . . ."). However, Ahmad has not alleged or identified facts that show an official policy or widespread pattern or practice that caused the alleged violation of the First Amendment right to exercise his religion. Ahmad has failed to allege or identify facts showing an official custom or policy of Harris County as the moving force behind a violation of the First Amendment. The motion

for summary judgment as to Ahmad's section 1983 claim against Sheriff Garcia in his official capacity and Harris County for the violation of the First Amendment is granted.

## V.    The Claims Against the Defendants in Their Individual Capacities

### A.    Qualified Immunity

The defendants assert that as a matter of law, they are entitled to qualified immunity because Ahmad failed to allege a constitutional violation and because the undisputed evidence shows that their actions were objectively reasonable in light of clearly established law.  (Docket Entry No. 48, Defendants' Motion for Summary Judgment, pp. 5-7).

Qualified immunity shields government officials from liability when they are acting within their discretionary authority and their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Flores v. City of Palacios,* 381 F.3d 391, 393-94 (5th Cir. 2004).

In reviewing a motion for summary judgment based on qualified immunity, a district court undertakes a two-step analysis. *Flores,* 381 F.3d at 395. First, a court must determine whether a statutory or constitutional right would have been violated on the facts alleged. *Saucier v. Katz,* 533 U.S. 194, 200 (2001); *Aucoin v. Haney,* 306 F.3d 268, 272 (5th Cir. 2002).  If no constitutional right would have been violated were the allegations established, then the inquiry ends. *Saucier,* 533 U.S. at 201.  If a violation is properly alleged, then the court proceeds to the second step in which it determines whether the defendant's actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Flores,* 381 F.3d at 395 (quoting *Hope v. Pelzer,* 536 U.S. 730, 739 (2002)).  Finally, if the law was clearly established at the time of the incident, the court must decide whether the defendant's conduct was objectively reasonable. *Aucoin,*

306 F.3d at 272. An official's conduct is objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the conduct violated the Constitution. *Hampton v. Oktibbeha Cnty. Sheriff Dep't*, 480 F.3d 358, 363 (5th Cir. 2007). Even if the government official's conduct violates a clearly established right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable. *Hernandez ex. rel. Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 879 (5th Cir. 2004).

The two-step procedure for determining qualified immunity established in *Saucier v. Katz*, 533 U.S. 194, 200 (2001), is no longer mandatory. *See Pearson v. Callahan*, ---- U.S. ---, 129 S. Ct. 808, 818 (2009) ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory."). Courts are free to consider the second prong without first deciding whether the facts show a constitutional violation. *Id.* The "decision does not prevent the lower courts from following the *Saucier* procedure; it simply recognizes that those courts should have the discretion to decide whether that procedure is worthwhile in particular cases." *Id.* at 821.

Once a government officer pleads the affirmative defense of qualified immunity, the burden shifts to the plaintiff to rebut the defense by establishing that the employee's allegedly wrongful conduct violated clearly established law. *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001). This burden requires the plaintiff to plead "claims of specific conduct and actions giving rise to a constitutional violation." *Baker v. Putnal*, 75 F.3d 190, 195 (5th Cir. 1996). "[T]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Mangieri v. Clifton*, 29 F.3d 1012, 1017 (5th Cir. 1994) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

**B.      The Claims Against Sheriff Garcia**

Under § 1983, a supervisory officer may only be held liable in his individual capacity if either of the following exists: (1) he is personally involved in the constitutional deprivation, or (2) there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violations. *Kohler v. Englade*, 470 F.3d 1104, 1114-5 (5th Cir. 2006). In this case, there is no allegation that Sheriff Garcia was personally involved in the alleged constitutional violation. Liberally construed, Ahmad alleges that Sheriff Garcia failed properly to train or supervise those officers working under him who were directly involved in the denial of Ahmad's right to exercise his religion.

Section 1983 does not create liability for a supervisor based on the acts of subordinate employees. *Oliver v. Scott*, 276 F.3d 736, 742 & n.6 (5th Cir. 2003). *Alton v. Tex. A & M Univ.*, 168 F.3d 196, 200 (5th Cir. 1999) ("Only the direct acts or omissions of government officials, not the acts of subordinates, will give rise to individual liability under § 1983."). Instead, an individual official may be liable only for participation in the implementation of a policy that is "itself . . . a repudiation of constitutional rights" and "the moving force of the constitutional violation." *Oliver*, 276 F.3d at 742.

Ahmad asserts that Sheriff Garcia implemented and enforced, through his staff, a policy that caused the violation of Ahmad's right to practice his Islamic faith in the HCJ. As discussed above, the summary judgment evidence shows that Jumu'ah services could not be held at the HCJ because volunteer imams were not available. Ahmad's own pleadings show that he had access to religious literature. Though Ahmad complains that he did not have access to his prayer rug and Kufi cap, Ahmad does not explain how this prevented him from praying in his cell. Ahmad's own pleadings

suggest that the lack of a prayer carpet only "hindered" his ability to pray in his cell.  (Docket Entry No. 30, Plaintiff's More Definite Statement, p. 7).  In response to Ahmad's grievance, Ahmad was provided with a Koran and a prayer time sheet on October 2, 2008. (Docket Entry No. 48, Defendants' Motion for Summary Judgment, Ex. 5, p. 36).  Ahmad was provided with the opportunity to meet with Dr. Kazi, a Muslim imam, on December 4, 2008.  (Docket Entry No. 48, Defendants' Motion for Summary Judgment, Ex. 5, p. 36).  Dr. Kazi provided Ahmad with religious material.  Sergeant Savell testified that Dr. Kazi visited the HCJ twice a month to address the specific religious needs of Muslim inmates.  The Defendants' summary judgment evidence shows that Ahmad was afforded the opportunity to practice Islam in the HCJ.  This court previously determined that the failure to provide Jumu'ah services was reasonably related to HCJ's legitimate penological interest in security.

Ahmad has not satisfied his burden of overcoming the defense of qualified immunity. Sheriff Garcia is entitled to summary judgment based on qualified immunity.

Sheriff Garcia is entitled to judgment as a matter of law on this individual claim.

### C.    Claims Against Captain John Hart

Ahmad claims that Captain Hart violated his civil rights by "declaring my grievance(s) against Chaplain Burrell as a non-grievable issue, or refusing to give a response or answer to grievances filed against the chaplaincy Dept. mailroom, and disciplinary officer[.]" (Docket Entry No. 30, Plaintiff's More Definite Statement, p. 3).

Captain John Hart testified as follows:

> 2.      I am licensed as a peace officer by the State of Texas, and have been licensed since July 2, 1979. I am employed by the Harris

County Sheriff's Office ("the Sheriff's Office"), where I hold the rank of captain.

3.     I understand that Plaintiff Abdul Hakim Ahmad also known as Albert Jenkins, SPN #1000334 ("Plaintiff") filed a lawsuit against me, and I have been served with a summons in that case. At the time of the events about which he complains, I was assigned as captain over the Sheriff's Office Grievance and Disciplinary Departments.

4.     To the best of my knowledge, I did not have any contact with Plaintiff. I did not review any of the grievances Plaintiff filed during this time period. I did not investigate any of Plaintiff's grievances, and I did not make any determinations as to whether any of the grievances filed by Plaintiff were founded or unfounded.

5.     The Sheriff's Office Grievance and Disciplinary Department maintains a listing of the current grievance history for each inmate in the Harris County Jail. A true and correct copy of Plaintiff's current grievance history is attached hereto as *Exhibit "A"*.

(Docket Entry No. 48, Defendants' Motion for Summary Judgment, Ex. 3, pp. 1-2).

Ahmad has not satisfied the first step in the qualified immunity analysis requiring him to show a violation of his constitutional rights.  Ahmad complains of Captain Hart's response to his grievance.  Ahmad's due process claim fails.  "A prisoner has a liberty interest only in freedoms from restraint imposing atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Geiger v. Jowers*, 404 F.3d 371, 373-74 (5th Cir. 2005) (internal citation and quotation omitted).  An inmate does not have a constitutionally protected liberty interest in having grievances resolved to his satisfaction.  There is no due process violation when prison officials fail to do so. *Geiger v. Jowers,* 404 F.3d 371, 373-74 (5th Cir. 2005); *see also Edmond v. Martin, et al.,* slip op. no. 95-60666 (5th Cir., Oct. 2, 1996) (unpublished) (prisoner's claim that a defendant "failed to investigate and denied his grievance" raises no constitutional issue); *Thomas v. Lensing, et al.,* slip op. no. 01-30658 (5th Cir., Dec. 11, 2001) (unpublished) (same).  Because

Ahmad has no liberty interest in the resolution of his grievances, the defendants' alleged failure to address the grievances did not violate a constitutional right.

Ahmad has not shown how the denial of his grievance violated his civil rights. He likewise failed to show that the actions of Captain Hart were objectively unreasonable. The competent summary judgment evidence reveals that Captain Hart did not have any contact with Ahmad, and he did not investigate any of Ahmad's grievances. Ahmad has not satisfied his burden of overcoming the defense of qualified immunity. Captain Hart is entitled to summary judgment based on qualified immunity.

**D.     The Claims Against Sergeant T.J. Zoch**

Ahmad alleges that Sergeant Zoch violated his civil rights by "refusing to answer my requests for assistance in establishing an Islamic service on the 5th floor in the room in which Christian services were held." (Docket Entry No. 30, Plaintiff's More Definite Statement, p. 3).

Sergeant Zoch testified as follows:

> 2.      I am duly certified as a peace officer by the State of Texas. I am employed by the Harris County Sheriff's Office, where I hold the rank of sergeant. I have been employed by the Harris County Sheriff's Office for over twenty-six (26) years.
>
> 3.      On Friday, December 5, 2008, as the fifth floor sergeant at the Harris County Jail facility located at 701 N. San Jacinto, Houston, Texas 77002, I met with Albert Jenkins, also known as Abdul Hakim Ahmad ("Ahmad"), regarding his complaint. Mr. Ahmad claims in his written complaint that there is no religious service established for Muslim inmates, that he has written numerous requests to the Chaplaincy Department regarding that issue, but that he has not been allowed to attend any Islamic services. Ahmad also claimed that a chaplain volunteer, upon visiting him, stated that the Chaplaincy Department does not have to represent Islam, and that if he had a problem, he should write his congressman or the NAACP. During our meeting, Ahmad cited the Harris County Sheriff's Department Inmate

Handbook at page 12, section 1. That section of the Harris County Sheriff's Department Inmate Handbook states in pertinent part as follows:

"(a) Religious services are scheduled on a regular basis for various denominations and faiths. If you have a special religious need(s) which is not currently being met, you may consult with a Jail Chaplain."

A true and correct copy of this section of the Harris County Sheriffs Office Inmate Handbook is attached to this Affidavit as *Exhibit "A"* and incorporated by reference for all purposes herein.

4.      Ahmad also requested that the Chaplaincy Department conduct a Friday Jumu'ah prayer service from 12:00 pm to 1:00 pm, allowing Muslim inmates to utilize the classroom for services.

5.      I advised Ahmad that I had contacted Chaplain Burrell, who at that time was a chaplain at the Harris County Jail. Chaplain Burrell advised that Ahmad's religious needs are being addressed, and that Ahmad has received religious material. Additionally, Chaplain Burrell stated that Dr. Kazi met with Ahmad on Thursday, December 4, 2008. Dr. Kazi is a Muslim volunteer at the Harris County Jail who addresses the needs of Muslim inmates. I advised Ahmad that Chaplain Burrell had advised that religious services are limited, but that nonetheless, a continuing effort of the Harris County Sheriff's Office Chaplaincy Department has been made to meet Ahmad's religious needs.

6.      As a result of the above, I determined that Ahmad's grievance was unfounded. A true and correct copy of the investigation of Ahmad's grievance, number 201946, is attached hereto as Exhibit "B".

7.      Although I am the fifth floor sergeant I have no control whatsoever over the prayer services which are conducted at the Harris County Jail. The officers assigned to the Jail call the inmates from the cell at all times when they are informed that the inmates should be called out for a service of his or her faith.

(Docket Entry No. 48, Defendants' Motion for Summary Judgment, Ex. 1, pp. 1-3).

The summary judgment evidence shows that Sergeant Zoch met with Ahmad concerning his requests for Jumu'ah services. Thereafter, Sergeant Zoch conferred with Chaplain Burrell to address Ahmad's grievance. Additionally, the summary judgment evidence shows that Sergeant Zoch lacked the authority to commence a Friday prayer service.

Ahmad was unhappy with Sergeant Zoch's response to Ahmad's grievance. As noted, an inmate does not have a constitutionally protected liberty interest in having grievances resolved to his satisfaction. There is no due process violation when prison officials fail to do so. *Geiger v. Jowers,* 404 F.3d 371, 373-74 (5th Cir. 2005).

Sergeant Zoch is entitled to judgment as a matter of law.

### E.     The Claims Against Sergeant Russel Smith

Ahmad claims that Sergeant Smith violated his civil rights by "denying my donated religious texts even after I complied with the guidelines of the Harris County Rule Book." (Docket Entry No. 30, Plaintiff's More Definite Statement, p. 3). Ahmad is apparently complaining of the return by the Harris County Sheriff's Office mailroom of a religious text. He further asserts that Defendant Smith "violated my civil rights by returning my legal mail to the courts as undeliverable when I was in fact still housed in the Harris County Jail."

Sergeant Russel Smith testified as follows:

> 2. I am licensed as a peace officer by the State of Texas. I am employed by the Harris County Sheriff's Office, where I hold the rank of sergeant. On January 22, 2009, I was assigned to the Commissary/Mailroom. On that day, I met with Harris County Jail inmate Albert Jenkins, SPN 01000334. Inmate Jenkins had filed a grievance indicating that he believed someone was sending back his legal/court mail or disposing of it in some way.

3. I spoke to Inmate Jenkins, who indicated that he believed one of the first shift deputies assigned to the 5th Floor at the Harris County Jail facility was sending back his legal/court mail or disposing of it in some way. First, I made sure that Inmate Jenkins understood the difference between privileged and non-privileged mail. After talking to Inmate Jenkins for a short time, he told me that he would consider the grievance resolved if I would contact the first shift 5th Floor sergeant and explain to him or her what was going on. He also asked that I ask the 5th Floor sergeant to make sure the first shift deputies and detention officers understood about privileged and non-privileged mail. I agreed to do so.

4.     On January 23, 2009, I sent an email to the 5th Floor sergeant, Sgt. Terry Zoch. I sent him the email to keep my word to Mr. Jenkins that I would send out something regarding his grievance.

5.     In my email, I asked Sergeant Zoch to ensure that the first shift deputies are made aware that they are not allowed to interfere with incoming privileged mail other than to ensure that it contains no contraband and that they are not allowed to interfere with outgoing privileged mail in any way. I attached a copy of the Texas Jail standards rules regarding inmate mail.

6.     A copy of my investigation of the grievance as well as a copy of my email to Sergeant Zoch dated January 23, 2009 is attached hereto as Exhibit "A".

(Docket Entry No. 48, Defendants' Motion for Summary Judgment, Ex. 2, p. 1).

Ahmad is complaining of the denial of access to the courts. Prisoners have a constitutional right to access the courts. *Bounds v. Smith,* 430 U.S. 817, 821 (1977); *Jones v. Greninger,* 188 F.3d 322, 325 (5th Cir. 1999). However, "*Bounds* did not create an abstract, freestanding right to a law library or legal assistance." *Lewis v. Casey,* 518 U.S. 343, 351 (1996). Instead, "meaningful access to the courts is the touchstone." *Id.* (internal quotation marks and citation omitted). To prevail on a claim of denial of access to courts, a prisoner must show actual injury. *Id.* at 349-52; *see also Christopher v. Harbury,* 536 U.S. 403, 415 (2002). "[B]efore a prisoner may prevail on a claim that

his constitutional right of access to the courts was violated, he must demonstrate 'that his position as a litigant was prejudiced by his denial of access to the courts.'" *McDonald v. Steward,* 132 F.3d 225, 230-31 (5th Cir. 1998) (citation omitted); *see also Lewis v. Casey,* 518 U.S. 343, 351 (1996).

In *Christopher v. Harbury,* 536 U.S. 403 (2002), the widow of a murdered Guatemalan citizen brought a *Bivens* action, contending, among other things, that certain federal officials concealed and covered up information regarding her husband's fate, and ultimate death, and that such concealment denied her the right of access to the courts. *Id.* In *Harbury,* the Supreme Court observed that access-to-courts claims fall into two categories: claims that "systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time," where the suits could be pursued "once the frustrating condition has been removed," and claims of "specific cases that cannot be tried (or tried with all material evidence), no matter what official action may be in the future." *Christopher v. Harbury,* 536 U.S. 403, 413-14 (2002). Regardless whether the claim "turns on a litigating opportunity yet to be gained or an opportunity already lost, the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Id.* at 414-15. A claim for deprivation of one's constitutional right of access to the courts must set forth in the complaint (1) "the underlying cause of action, whether anticipated or lost," and (2) "the official acts frustrating the litigation." *Id.* Moreover, to prevail on an access-to-courts claim, an actual injury must result from the defendant's conduct. *Chriceol v. Phillips,* 169 F.3d 313, 317 (5th Cir. 1999) (citing *Lewis v. Casey,* 518 U.S. 343, 351-54 (1996)). Thus, the access-to-courts right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court. It follows that the underlying claim is an element that must be described in the complaint as though it were being independently pursued;

and that, when the access claim (like this one) looks backward, the complaint must identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought. The underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give the defendant fair notice. The plaintiff must describe the predicate claim well enough to apply the "nonfrivolous" test and to show that the "arguable" nature of the underlying claim is more than hope. *Harbury,* 536 U.S. at 416.

Though Ahmad claims that the Defendants interfered with his legal mail, he apparently abandons this claim. In his response to this court's Order for a More Definite Statement, Ahmad states that he understands that he cannot establish a denial of access to the courts without first showing some harm. (Docket Entry No. 30, Plaintiff's More Definite Statement, p. 10). Ahmad further chose not to answer this court's interrogatories concerning his access-to-the-courts claim.

Even if Ahmad has not abandoned this claim, this court finds, alternatively, that Ahmad fails to specify, either in his complaint, more definite statement, or grievances, what sort of claims he is or was unable to litigate. Ahmad has not demonstrated that his position as a litigant was prejudiced by his denial of access to the courts. This claim lacks merit, and the Defendants are entitled to judgment as a matter of law on this claim.

### F.     The Claims Against Deputy Darrell Criss

Though Ahmad names Deputy Criss as a defendant, he does not explain how he violated Ahmad's civil rights.

Deputy Darrell Criss testified as follows:

> 2.     I am licensed as a peace officer by the State of Texas. I am employed by the Harris County Sheriff's Office ("the Sheriff's Office"). In November 2008, I was assigned to the 701 Grievance

Board. The Sheriff's Office 701 Grievance Board is the board which is assigned to hear and resolve grievances of inmates who are housed in the Harris County Jail facility located at 701 N. San Jacinto, Houston, Texas 77002.

3.     I am aware that Abdul Hakim Ahmad filed a lawsuit against me. Ahmad is also known as Albert Jenkins, SPN # 1000334.

4.     I only had two contacts with Mr. Jenkins as far as I can recall. In the first, I responded to a letter received from Mr. Jenkins with regard to grievance number 201941. I informed him that this grievance was still pending, and that it was under investigation. I informed him that he would be notified of the findings with regard to his complaint by the investigating supervisor, officer, or sergeant, and that this matter is considered a "housing" matter because the personnel involved is part of housing. A true and correct copy of my response to Mr. Jenkins is attached to this Affidavit as Exhibit "A" and incorporated by reference for all purposes herein.

5.     I also received a letter from Mr. Jenkins dated January 12, 2009. This letter requested that he be advised of the status on three grievances he had filed. The action taken with regard to this letter was to forward case status information to Mr. Jenkins. A true and correct copy of Mr. Jenkins' January 12, 2009 letter is attached hereto as Exhibit "B" and incorporated by reference for all purposes herein.

(Docket Entry No. 48, Defendants' Motion for Summary Judgment, Ex. 4, p. 1).

Ahmad has not shown how Deputy Criss violated his civil rights. The summary judgment evidence shows that Deputy Criss was a member of the Sheriff's Office 701 Grievance Board. As a member of the Grievance Board, Deputy Criss was responsible for addressing inmate grievances. Deputy Criss testified that he had two contacts with Ahmad; both related to grievances Ahmad had filed. Deputy Criss advised Ahmad of the status of his grievances. To the extent Ahmad was somehow dissatisfied with the responses to his grievances, such claim lacks merit. Ahmad has failed to show that the actions of Deputy Criss were objectively unreasonable. The competent summary

judgment evidence reveals that Deputy Criss had very limited contact with Ahmad in the form of written correspondence relating to grievances Ahmad had filed.

Ahmad has not satisfied his burden of overcoming the defense of qualified immunity. Deputy Criss is entitled to summary judgment based on qualified immunity.

### G.     The Claims Based on the Denial of Hygiene Items

Ahmad was confined in the HCJ because he violated the terms of his parole.  (Docket Entry No. 48, Defendants' Motion for Summary Judgment, Ex. 5, p. 11).  As a parole violator, Ahmad occupied the position of a pretrial detainee during his incarceration at the HCJ.  *See Hamilton v. Lyons,* 74 F.3d 99, 106 (5th Cir. 1996).  A pretrial detainee's challenge to the conditions of his confinement ordinarily implicates the Fourteenth Amendment Due Process Clause, which requires that conditions of confinement satisfy certain minimal standards for pretrial detainees. *See Bell v. Wolfish,* 441 U.S. 520, (1979).  In that respect, the Due Process Clause prohibits conditions of confinement that are imposed for the purpose of punishment. *Bell,* 441 U.S. at 538.  Because Ahmad does not allege or show that he was subjected to unconstitutional conditions of confinement for punitive purposes, he does not demonstrate a violation of the Due Process Clause.  Detained parolees who cannot support a claim of unconstitutional conditions under the Fourteenth Amendment may also seek relief under the Eighth Amendment because "[t]he constitutional rights of parolees are at least as extensive as those of convicted prisoners." *Hamilton,* 74 F.3d at 106 n.8.

The Fifth Circuit has stated that the deliberate-indifference standard is an "extremely high" one to meet. *Domino v. Tex. Dep't of Criminal Justice,* 239 F.3d 752, 756 (5th Cir. 2001).  "A prison official acts with deliberate indifference 'only if [(A)] he knows that inmates face a substantial risk

of serious bodily harm and [(B)] he disregards that risk by failing to take reasonable measures to abate it.'" *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (quoting *Farmer*, 511 U.S. at 847).

Ahmad complains that he was deprived of undergarments and forced to wear a prison uniform for seven consecutive days. He also complains of the denial of an adequate amount of hygiene items. Ahmad fails to show that Jail officials were deliberately indifferent to a substantial risk of serious harm or that his conditions of confinement otherwise posed a constitutional violation. Ahmad has not established that the Defendants acted with deliberate indifference to his conditions of confinement. The Defendants are entitled to judgment as a matter of law on this claim.

## VI.     The Claims Against the Remaining Defendants

Ahmad has also sued Chaplain Burrell. Though Chaplain Burrell filed an answer, (Docket Entry No. 45), he did not file a dispositive motion. In addition, Ahmad named Sergeant Brown and Chaplain Kazi as defendants, but they were not served.

The summary judgment motions filed by Sheriff Garcia, Captain Hart, Sergeant Zoch, Sergeant Smith, and Deputy Criss dispose of all the claims Ahmad has presented. Because all the other similarly situated defendants have established that Ahmad has no basis for his claims, Ahmad cannot recover against the other similarly situated defendants. When one defending party establishes that the plaintiff has no cause of action, as Sheriff Garcia, Captain Hart, Sergeant Zoch, Sergeant Smith, and Deputy Criss have in this case, this defense inures to the benefit of the other, similarly situated, defendants, Chaplain Burrell, Sergeant Brown, and Chaplain Kazi. *See Lewis v. Lynn*, 236 F.3d 766, 768 (5th Cir. 2001) (quoting *United States v. Peerless Ins. Co.*, 374 F.2d 942, 945 (4th Cir. 1967) (citations omitted)). Ahmad's claims against Chaplain Burrell, Sergeant Brown, and Chaplain Kazi lack merit and are dismissed with prejudice. 28 U.S.C. § 1915(e)(2)(B).

## VII. Conclusion

The motions for summary judgment filed by Defendants Sheriff Adrian Garcia, Captain J. T. Hart, Sergeant Zoch, Sergeant Smith, and Deputy D. Criss, (Docket Entry Nos. 48 & 49), are GRANTED. Ahmad's motion for partial summary judgment, (Docket Entry No. 66), is DENIED. Ahmad's motion for production, (Docket Entry No. 67), motion for subpoena, (Docket Entry No. 69), and motion for law library time, (Docket Entry No. 77), are DENIED as moot. Any and all remaining pending motions are DENIED as moot.

Ahmad's claims against Chaplain Burrell, Sergeant Brown, and Chaplain Kazi lack merit and are DISMISSED with prejudice under 28 U.S.C. § 1915(e)(2)(B) as without an arguable basis in law.

The Clerk will provide a copy of this order by regular mail, facsimile transmission, or e-mail to the parties and to the TDCJ - Office of the General Counsel, Capitol Station, P.O. Box 13084, Austin, Texas, 78711, Fax: 512-936-2159.

SIGNED at Houston, Texas, on Sept. 23, 2010.

VANESSA D. GILMORE
UNITED STATES DISTRICT JUDGE

O:\RAO\VDG\2008\08-1591.i02.wpd

35